IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

BARRON L. HAWTHORNE, #1442400      §

VS.                                §                 CIVIL ACTION NO.9:12cv70

VALENTINO ESPINO, ET AL.           §

MEMORANDUM OPINION AND ORDER

Plaintiff Barron L. Hawthorne, an inmate confined in the Gib Lewis Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit under 42 U.S.C. § 1983.   The complaint was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636(c).

I.      **BACKGROUND**

The complaint was filed on May 14, 2012.  Plaintiff claims that on January 11, 2012, he was coming back from a sick call to his cell and stopped to pick up a grievance form.  He knelt down in the hall in front of the office and refused to get up when ordered to do so.  An extraction team came and placed him on a gurney, in restraints, to take him to his high security inside cell.   Still in the restraints, he was placed on the floor in his cell and told to stay down on the floor while the extraction team exited the cell.   However, he rolled over on his side or started to move toward a locker and yelled at the extraction team.  The extraction team then re-entered the cell.  He claims he was placed on the floor again and Defendant Espino began hitting him in the head and slamming his face into the floor while other officers held him down by his arms and legs and did nothing to stop

1

Defendant Espino from hitting him.  He alleges he was hit 20-25 times, resulting in injuries to his head, face, left eye, nose and left and right cheekbones.  In addition, Plaintiff alleges that while he was held down, Defendant Reynolds twisted his testicles, which he characterized as a "sexual assault."

The extraction team left Plaintiff in his cell.  A search of his cell revealed a shank-type weapon in his locker, approximately 7" long and made from a piece of fencing.  It was shaped more or less like an ice pick.  He was not taken to medical because, he was told, he was being "too aggressive."  He further alleges that when they were done, Defendant Sgt. Whingham directed the remainder of the team to take all of his property and left him "butt naked" in his cell with air conditioning blowing in January.  He asserts that he was denied lunch and dinner.  At some point, Defendant Licensed Vocational Nurse Mattox saw him at his cell and he told her also about Defendant Reynolds twisting his testicles, but she left without giving him medical care.  He testified it was 27 hours after he was left in his cell before he was given medical care at the unit's dispensary.  He asserted that he eventually had surgery on his nose with a closed reduction for the bleeding, but that his nose was still crooked.  Although his cheekbones were found to have been fractured, they have never been fixed because the fractures did not interfere with his eating or talking.

In this lawsuit, Plaintiff sued Defendants Espino and Reynolds for their alleged excessive use of force; Defendant LVN Mattox for denial of medical care; and Defendant Officers Riley, Clark, Combs, Whingham and Sells, for failing to intervene or protect him from the excessive use of force.  He also claimed Defendant Whingham denied him lunch and dinner on January 11, 2012, and ordered the confiscation of all of his property.  He seeks $25,000 in compensatory damages and $25,000 in punitive damages.  Following an evidentiary hearing conducted on August 9, 2012, in

accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), the Court dismissed all Defendants except Defendants Espino and Reynolds, ordered that they answer the complaint and allowed Plaintiff to proceed on a claim of excessive use of force.  The Court's Order to Answer and Scheduling Order established the schedule for filing, among other things, dispositive motions.  The timing was keyed to the filing of Defendants' answer, which was filed on September 28, 2012.  *See* docket entry #14.  By the terms of the Order to Answer and Scheduling Order, Defendants had 60 days after the filing of the answer to file a motion for summary judgment ("MSJ") on the issue of exhaustion of administrative remedies and 100 days in which to file an MSJ on issues other than exhaustion.  Defendants did not file an MSJ on the issue of exhaustion, but on January 2, 2013, filed a Motion to Stay Future Deadlines (docket entry #26), predicated on a conversation with Plaintiff in which he indicated he would dismiss his lawsuit.  However, also on January 2, 2013, Plaintiff filed a Notice (docket entry #27) with the Court that he had received Defendants' evidence and believed he could prevail; therefore, he would not be filing a motion to voluntarily dismiss his lawsuit, rendering Defendants' Motion to Stay moot.

On January 4, 2013, Defendants then filed a Motion for Extension of Time to File Motion for Summary Judgment (docket entry #29), reciting Plaintiff's decision to go forward and seeking a 30-day extension of time in which to file their MSJ on issues other than exhaustion.  Plaintiff did not oppose the request for extension of time and the Court will grant it.  On January 25, 2013, Defendants filed their MSJ (docket entry #30).  On February 11, 2013, Plaintiff filed a Motion to Deny Defendants' Motion for Summary Judgment (docket entry #34) (the "Opposition").

Also pursuant to the Order to Answer and Scheduling Order, Defendants have filed their Exhibit and Witness Lists (docket entries #31, 32); Plaintiff has not complied with the order to file

3

such lists.

## II.       STANDARD ON SUMMARY JUDGMENT

Rule 56(a), Fed. R. Civ. P., provides that the Court may only grant a motion for summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *VRV Development L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011) (quoting Fed.R.Civ.P. 56(a)).   The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine dispute as to a material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).   The moving party, however, "need not negate the elements of the nonmovant's case."   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).   The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case.   *Stults v. Conco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).   Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial.   *Id*.   Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden.   *Id*.

Summary judgment is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions.   *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987).   The district court must look to the full record, including the pleadings, affidavits, and depositions.   *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).   Under this standard, fact questions are considered with deference to the nonmovant.   *Reid v. State Farm Mutual Automobile*

*Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986).  The court resolves factual controversies for purposes of summary judgment in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  *Little*, 37 F.3d at 1075.  The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.  *Wallace v. Texas Tech University*, 80 F.3d 1042, 1048 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  An issue is "genuine" if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inference in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of the party.  *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987).  A "material fact" is one that might affect the outcome of the suit under governing law.  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  "When the moving party has carried its burden under Rule 56(c),[1] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (footnote omitted).

Furthermore, in that this is a civil rights claim pursuant to 42 U.S.C. § 1983, "To invoke the

---

[1]     The predecessor to the current Rule 56(a).

jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lemons v. Swann*, 412 Fed. Appx. 672, 673 (5th Cir. 2011) (per curiam) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)).

## III.   DISCUSSION AND ANALYSIS

At issue is Plaintiff's claim of excessive use of force against Defendants Espino and Reynolds.   Defendants raise defenses of Eleventh Amendment immunity against any claims brought against them in their official capacities; and qualified immunity for any claims brought against them in their individual capacities.   As part of the argument for qualified immunity, Defendants argue that Plaintiff's excessive use of force claim fails on the merits.

### A.      Eleventh Amendment Immunity

Defendants assert that they are employees of the state such that they are immune under the Eleventh Amendment to being sued in their official capacities.   MSJ at 5.   The Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983.   *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).   In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."   The Supreme Court therefore upheld the dismissal of the Michigan Department of State Police and its Director sued in his official capacity.   *Id*.   The Fifth Circuit has accordingly "held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity."   *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).   Plaintiff has only sued the Defendants in this case for money damages, *see* Complaint at 4 (PageID #5),  and may not recover on the basis of Defendants' official

capacities.   However, Defendant simply assumes Plaintiff is suing him in his official capacity, which is not apparent from the complaint or other pleadings.  To the extent that Plaintiff is suing him in his individual capacity, Eleventh Amendment immunity does not prevent the lawsuit.

### B.        Excessive Use Of Force

Before proceeding to Defendants' claim of qualified immunity, the Court will examine the merits of the excessive use of force claim, which must be determined in any case in the qualified immunity analysis.

The Supreme Court has emphasized that the core judicial inquiry in an Eighth Amendment excessive use of force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *See Hudson v. McMillian*, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).   An excessive use of force claim has both subjective and objective components.  *Id*. at 8.   In other words, there is the issue of whether the officials acted with a "sufficiently culpable state of mind" and if the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.  *Id*.  A claimant must allege and prove there was an "unnecessary and wanton infliction of pain."  *Id*. at 5.   In deciding whether the use of force was wanton or unnecessary, a court may consider "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  *Id*. at 7 (internal quotation and citation omitted).   The absence of a serious injury is relevant to but not dispositive of the excessive force claim.  *Id*.

The Supreme Court added the following caveat concerning the nature of the force used in a given situation:

That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d, at 1033[2] ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9-10 (other citations omitted).

On remand from this decision, the Fifth Circuit has identified five factors which should be considered in determining whether an unnecessary and wanton infliction of pain was done in violation of an inmate's right to be free from cruel and unusual punishment. These factors are: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *See Hudson v. McMillian*, 962 F.2d 522, 523 (5th Cir. 1992); *see also Williams v. Valenti*, 2011 WL 2650883, at *1 (5th Cir. July 7, 2011) (citing *Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998)).

Here, Defendants rely exclusively on the prison unit's Use of Force Report (Exhibit A), the affidavit of Jonathan D. Reynolds (Exhibit B) and the Use of Force Video (Exhibit C) in support of their claims with regard to whether or not they employed excessive use of force. Notably, the Court has previously reviewed the Use of Force Video and Report, following the *Spears* hearing it conducted in August 2012, when the Court issued its Memorandum Opinion and Order of Partial Dismissal on August 27, 2012 (docket entry #10). Then, the video in particular informed the Court's decision that it was not possible to determine whether Defendants Espino and Reynolds had or had

---

[2]       *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d 324 (1973).

not employed excessive force while securing and escorting Plaintiff to his cell and during the melee that ensued while the extraction team attempted initially to withdraw from Plaintiff's cell and ordered him to remain still during the withdrawal.

Little has changed with regard to Defendants' MSJ. Defendants first discuss an initial use of force that occurred while transporting Plaintiff to his cell after he refused to get up off the floor in the hallway. Plaintiff's feet had been shackled; his hands were cuffed behind his back; and he was strapped onto a gurney for transport. Initially placed face down on the gurney, the video shows that the officers had rolled him onto his side to prevent positional asphyxiation. However, during the actual transport, it is clear on the video that he had rolled back to a face-down position.

Based on the Reynolds Affidavit (Ex. B at MSJ 69) and the Use of Force Report (Ex. A at MSJ 11), Defendants assert that during the transport, Plaintiff grabbed Defendant Espino's pants, and Defendant Espino responded by hitting Plaintiff on the arm. On the video, however, the transport team of at least six officers handling the gurney had paused at a security door (the "sally port") and waited until it opened. The lead officer on the left side of the gurney - presumably Officer Espino - was stationed approximately at Plaintiff's head. Plaintiff's arms are visible and his wrists cuffed together, well behind Officer Espino's position, more aligned with the second officer on the left side. As the team moved the gurney through the sally port, the lead officer can be seen cocking his right arm back and forcibly punching forward and down toward Plaintiff, though the ultimate impact cannot be seen. *See* Ex. C at 4:10 - 4:12. Also unseen is the cited grabbing of Officer Espino's pants. From the positioning of Officer Espino and the cuffing of Plaintiff's hands, it is not clear to the Court how Plaintiff could have grabbed the pants, at least of the lead officer. That alone causes a question of fact. Additionally, a review of the incident that is part of the Use of Force

Report states:

> On January 31, 2012, while conducting a fact-finding inquiry on MA-00196-01-12, it was discovered that Officer Espino struck an offender while on a gurney in hand restraints. Officer Espino stated that the offender grabbed his pants, which caused him to strike the offender in the arm with his fist. Statements from the other team members indicated that the offender did grab Officer Espino's pants, but Officer Espino had a means of escape by pulling away from the offender rather than striking him.

Ex. A at MSJ 10. The report further stated that "Officer Espino admits he reacted too quickly and should not have struck the offender." *Id*. He was placed on disciplinary probation for three calendar months between February 13, 2012, and May 12, 2012. *Id*. The report was signed by Senior Warden II Cody Ginsel on February 13, 2012. *Id*. Such an admission and findings further create a question of fact as to whether Officer Espino reacted with excessive force, even if Plaintiff did grab his pants during the transport. In terms of the *Hudson* factors, first, there is little indication of any actual injury suffered as a result of Plaintiff's being hit in the arm or shoulder; still, a fair viewing of the video shows that the punch was considerably more than just swatting a hand away. It involved a definite cocking-back of the arm and strong thrust downward. Second, there was little, if any, need for this application of force. Plaintiff was shackled hand and foot with his hands behind him and strapped face-down on a gurney. The Use of Force Report itself indicates the appropriate action would have been to simply pull away instead of punching Plaintiff. Third, it follows that there was no reason to apply the amount of force when there was little or no need for force to begin with. Fourth, it is clear that Defendant Espino was occupied with a dangerous operation, *i.e.*, transporting an uncooperative and aggressive inmate. Nonetheless, Plaintiff was nearly immobilized in his position, even if he could flex his wrists and possibly grasp with his hand. It is difficult to perceive a reasonable threat. Finally, Defendant Espino clearly could have inflicted a more forceful response

10

than he did.  However, again, there was no need to do more than simply pulling away from Plaintiff instead of hitting him.  On balance, the only real question is whether Plaintiff suffered an injury, which will be for the finder of fact to decide.

Next, Defendants assert that they used no more force than was appropriate and reasonable in re-entering Plaintiff's cell to subdue him after he moved while the extraction team was trying to withdraw upon delivering Plaintiff after the transport.  They assert as a statement of undisputed fact that while the extraction team was withdrawing, "Plaintiff suddenly attempted to get up onto his feet and move toward his locker," causing their re-entry and that they "used their weight to restrain [Plaintiff] on the floor of the cell."  MSJ at 3.  They limit the scope of Plaintiff's injury from this action to "a cut to his left eye and a fractured nose," which they assert are "consistent with the extractions teams' efforts to restrain Plaintiff," and assert that the Use of Force Video controverts Plaintiff's claims that Defendant Reynolds twisted his testicles.  MSJ at 8-9.  They do not address Plaintiff's claims of broken cheekbones.  Nonetheless, this Court has already taken testimony and evidence in the form of medical records during the August 2012 *Spears* hearing, which the Court has previously summarized on the record as:

> Nurse Gray testified that Plaintiff's medical records showed two separate use of force examinations on January 11, 2012.  The first was when the extraction team physically picked Plaintiff up initially and placed him on the gurney to return to his cell.  That was at approximately 9:59 a.m. and examination showed Plaintiff had no injuries.  The second was at approximately 10:01, after the incident in Plaintiff's cell, and examination showed lacerations to Plaintiff's left eye, which was swollen shut, and contusions to his cheeks.  She testified that the records showed Plaintiff was seen cell side at approximately 10:09 a.m. by Defendant Mattox.  However, because of Plaintiff's aggressiveness at that time, she was unable to give him any first aid or to take him out of his cell.  A nurse saw him to rule out facial fractures.  However, he was later transported to the hospital in Galveston on January 13, 2012.  X-rays showed his cheekbone was fractured by the eye and his nose was also fractured.  He also had a CAT scan, showing a displaced bilateral nasal fracture and right cheekbone fracture.  He had surgery by a plastic surgeon to repair the nasal fracture with a

closed reduction and splint on January 18, 2012.  He also had an ophthalmology consult and his blurred vision was resolved.  He had a follow-up examination with the plastic surgeon on January 27, 2012, and other follow-ups in January and February.

*See* Memorandum Opinion and Order of Partial Dismissal, docket entry #10, at 3-4.  Clearly, the extent of Plaintiff's injury, as documented in his prison medical records, exceeds that described in the MSJ.  Further, the timeline addressed above shows that there were no injuries prior to the transport to Plaintiff's cell and that the injuries were incurred during the incident in Plaintiff's cell.

In addition, the Court has again reviewed the Use of Force Video and has reaffirmed its original observation that once Plaintiff was placed on the floor in his cell, the video only shows him from about the waist down; his torso and head/shoulders area cannot be seen.  Specifically, the video does not substantiate whether Officer Espino did or did not strike Plaintiff in the face or hit his face or head on the floor numerous times, as Plaintiff claims.  However, during the Use of Force investigation, Officer Espino responded to the question whether he struck Plaintiff in the cell that he "hit him 3 times in the cell.  I struck him because he was reaching into his locker."  Ex. A at MSJ 13.[3]  Office Espino also stated in response to the question "How did offender Hawthorne receive his injuries?" that "I grabbed his hand when he was reaching for his locker.  He was resisting.  Clark struck him in the head on his right side.  He was still resisting and reaching towards his locker.  I struck him on his left side.  After we struck him he stopped resisting and we cuffed him."  *Id*.  Those admissions alone exceed Defendants' claim that they simply used their weight to subdue Plaintiff,[4]

---

[3]     Other officers responded to this question differently.  Some simply stated they did not see Officer Espino strike Plaintiff in the cell; others said, "only at the sally port," and Officer Clark responded "Just me and Espino struck him.  We struck him because he was resisting and reaching into his locker.  We later found a shank in the locker."  Ex. A at MSJ 13-14.

[4]     Additionally, Defendants assert that Plaintiff attempted to get up.  The only thing that is clear from the video is that as the extraction team was withdrawing (in fact, nearly gone),

though they also assert that "[i]f Officer Espino did strike the offender in the face at this time, as alleged by Plaintiff, the force was reasonably necessary, given the perceived risk and the Defendants' efforts to restore control." MSJ at 9.

Furthermore, as to Officer Reynolds, despite Defendants' argument in the MSJ, it is not at all clear from the Use of Force Video whether Defendant Reynolds or anyone else did nor did not twist Plaintiff's testicles. The simple fact that Plaintiff was lying face down on the floor is not probative. The officers had pulled his prison jumpsuit off; he could be seen naked from the buttocks to his feet, with his legs splayed apart and at one time or another, officers on the floor or standing between his legs. This is an issue of fact for the fact-finder to determine.

At bottom, there are inconsistent statements by the officers as to exactly how Plaintiff obtained his injuries and those injuries were more extensive than represented in the MSJ. It is unclear whether Officer Espino hit Plaintiff with his hand or hit his head onto the floor, as Plaintiff contends, and it is equally unclear how many times that happened and whether it happened after Plaintiff had been subdued.

Again reviewing the *Hudson* factors, first, as noted above, the injuries Plaintiff sustained were documented and exceed those described in the MSJ. They included a broken nose, a fractured cheekbone near an eye, blurred vision and various contusions and lacerations to the face. In addition, despite the assertion in the MSJ that Plaintiff did not complain of an injury to his testicles, he has submitted medical records in his Opposition to show that he did in fact do so. *See* Opposition (docket entry #34) at attachments. It is unclear whether Plaintiff suffered any actual injury to his

---

Plaintiff's legs moved along the floor. They did not move in an action consistent with getting up, but it is entirely possible that he moved toward his locker. However, that is indeterminate because the only part of Plaintiff visible at that point was his lower legs.

testicles, but the remaining injuries to his head are clearly greater than *de minimis*.

Second, there is no question that there was a need for the application of force.  In the video, Plaintiff clearly did move his legs after being told to lie still while the extraction team was withdrawing from the cell.  It is unclear from the video if he was reaching for his locker, but it is undeniable that a 6.5 - 7" sharpened shank was found in the locker after he was again subdued; it was displayed on the video.

Third, the relationship between the need for force and the amount of force used is an issue of fact.  Without question, Plaintiff's head injuries were severe and required hospital treatment.  If several officers were holding him down with their weight, the question remains whether Officer Espino (and/or Clark, who is no longer a Defendant here) needed to strike him with the force (or repetitions) needed to break a cheekbone, his nose and incur the other injuries.

Fourth, if Plaintiff was reaching for the shank, as statements document, the officers and Officer Espino in particular could reasonably have perceived a threat.

Fifth and finally, there is no way to gauge whether there was any effort to temper the severity of the response, at least in terms of the not-visible actions taken around Plaintiff's head during the re-entry.

On balance, some factors favor Defendants and some favor Plaintiff's claims.  However, at bottom, this is an issue of fact for a fact-finder to determine, particularly given the limited scope of the Use of Force Video.

### C.    Qualified Immunity

Defendants ultimately assert that they are entitled to qualified immunity from Plaintiff's claims.  The defense of qualified immunity shields government officials performing discretionary

functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The Supreme Court held that courts are initially required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id*. at 201. Second, if the Plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. With respect to the second step, the Fifth Circuit has held that "a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232, 123 S. Ct. 1355, 155 L. Ed. 2d 196 (2003).

The Supreme Court recently revisited *Saucier v. Katz* in *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L. Ed. 2d 565 (2009). The Court held that "experience supports our present determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Id*. at 234. The Court went on to hold that "while the sequence set forth in [*Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the

15

district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The Supreme Court noted that the *Saucier* procedure sometimes unnecessarily "results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id.* at 236-37. It was further noted that courts are free to follow the *Saucier* procedure, but the decision "simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.* at 242. The Supreme Court went on to discuss the facts of the case and found that the defendants were entitled to qualified immunity because the officers' conduct did not violate clearly established law. *Id.* at 244.

Absent a finding of undisputed fact as to what occurred to cause Plaintiff's head injuries and whether he was injured at all with regard to his testicles, it is impossible to determine here whether Defendants used excessive force against Plaintiff and whether the circumstances were such to support a finding that their actions were objectively reasonable in context. Therefore, a genuine issue of material fact exists on this issue and it must be resolved by the finder of fact.

Defendants have not shown that there is no "genuine dispute as to any material fact." On the other hand, Plaintiff's Opposition (bolstered by testimonial and documentary evidence presented during the August 2012 *Spears* hearing) tends to create a genuine dispute, meaning that Defendants are not entitled to summary judgment. *VRV Development L.P.*, 630 F.3d at 455; Fed. R. Civ. P. 56(a). It is accordingly

**ORDERED** that Defendants' Motion to Stay (docket entry #26) is hereby **DENIED** as **MOOT**. It is further

**ORDERED** that Defendants' Motion for Extension of Time to File Motion for Summary Judgment (docket entry #29) is hereby **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion to Deny Defendants' Motion for Summary Judgment (docket entry #34), construed as his Opposition to the Motion for Summary Judgment, is hereby **GRANTED**.  It is finally

**ORDERED** that Defendants' Motion for Summary Judgment (docket entry #30) is hereby **DENIED**.

So **ORDERED** and **SIGNED** this **8** day of **August, 2013.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

17